## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

CATHERINE PEACOCK,
             Plaintiff,

v.                                        No:   3:06cv67/MCR/MD

JO ANNE B. BARNHART,
Commissioner of Social Security,
             Defendant.

_____

### REPORT AND RECOMMENDATION

This case has been referred to the undersigned magistrate judge pursuant to the authority of 28 U.S.C. § 636(b) and Rules 72.1(A), 72.2(D) and 72.3 of the local rules of this court relating to review of administrative determinations under the Social Security Act and related statutes.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Social Security Act for review of a final determination of the Commissioner of Social Security (Commissioner) denying claimant Peacock's application for disability insurance benefits under Title II of the Act, and her application for Supplemental Security Income (SSI) benefits under Title XVI of the Act.

Upon review of the record before this court, it is the opinion of the undersigned that the findings of fact and determinations of the Commissioner are not supported by substantial evidence; thus, the decision of the Commissioner should be reversed and remanded for further proceedings.

## PROCEDURAL HISTORY

Plaintiff filed applications for disability insurance benefits and supplemental security income on March 18, 2003 alleging an onset of disability date of April 4, 2002.  Her applications were denied initially and on reconsideration, and she timely requested a hearing before an Administrative Law Judge (ALJ).  A hearing was held on June 10, 2005, at which plaintiff was represented by counsel and testified in behalf of her applications.  The ALJ rendered an unfavorable decision on July 15, 2005 (Tr. 11) and the Appeals Council denied her request for review (Tr. 6), making the decision of the ALJ the final decision of the Commissioner, and therefore subject to review in this court.  *Falge v. Apfel*, 150 F.3d 1320 (11th Cir. 1998).  This timely appeal followed.

## FINDINGS OF THE ALJ

After her evaluation of the evidence, relative to the issues raised in this claim, the ALJ made the following findings:

1) Plaintiff had severe conditions of cervical and lumbar degenerative disc disease, depression and fibromyalgia, but that these severe impairments did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4;

2) Plaintiff's allegations concerning her limitations were not totally credible;

3) Plaintiff had the residual functional capacity to perform light work, although she was limited to simple, unskilled work, with only occasional contact with coworkers and the public and occasional supervision;

4) Plaintiff was unable to perform her relevant past work because of these limitations;

5) Plaintiff was a younger individual with a high school education and no transferrable skills;

6) Plaintiff had the residual functional capacity to perform a "significant range of light work" and that the medical-vocational rules, Rule 202.21, would direct a conclusion of not disabled; and

7) Plaintiff was not under a "disability" as defined in the Act at any time through the date of the ALJ's decision.

## STANDARD OF REVIEW

The court must determine whether the ALJ's decision is supported by substantial evidence in the record and whether it is premised upon correct legal principles. *Ellis v. Barnhart,* 355 F.3d 1272, 1275 (11th Cir. 2003); *Lewis v. Callahan*, 125 F.3d 1436, 1439 (11th Cir. 1997); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). "A determination that is supported by substantial evidence may be meaningless, however, if it is coupled with or derived from faulty legal principles." *Graham v. Bowen*, 790 F.2d 1572 (11th Cir. 1986) (quoting *Boyd v. Heckler*, 704 F.2d 1207, 1209 (11th Cir. 1983)). In determining whether substantial evidence exists, the court reviews the record as a whole, taking into account evidence favorable as well as unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Tieniber v. Heckler*, 720 F.2d 1251, 1253 (11th Cir. 1983); *Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 590 (11th Cir. 2006) (Table, text in WESTLAW). Substantial evidence, which is more than a scintilla, but less than a preponderance, is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Ellison*, 355 F.3d at 1275; *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)(citations omitted). If the Commissioner's decision is supported by substantial evidence, and based upon sound legal principles, it must be affirmed, "even if the proof preponderates against it." *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004) (quoting *Miles v. Chater*, 84 F.3d 1397, 1400 (11th Cir. 1996)).

A disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in five steps.  A finding of disability or no disability at any step renders further evaluation unnecessary.  The steps are:

1.      Is the individual currently engaged in substantial gainful activity?

2.      Does the individual have any severe impairment?

3.      Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

The claimant bears the burden of establishing a severe impairment that keeps her from performing her past work.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step 5 to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  *Foote v. Chater,* 67 F.3d 1553, 1559 (11th Cir. 1995); *MacGregor v. Bowen*, 786 F.2d 1050, 1052 (11th Cir. 1986); *Brooks v. Barnhart*, 133 Fed.Appx. 669, 670 (11th Cir. 2005).  The Commissioner can do this through application of the Medical-

Vocational Guidelines, also known as the "grids," or expert vocational testimony. *Foote*, 67 F.3d at 1559.   If the Commissioner carries her burden, claimant must prove that she cannot perform the work suggested by the Commissioner.  *Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987); *Brooks, supra.*


## PLAINTIFF'S MEDICAL HISTORY

The medical evidence in the record begins before plaintiff's alleged onset date of April 3, 2002.  On February 6, 2001, plaintiff had an MRI of her cervical spine due to neck pain with left upper extremity numbness.  (Tr. 136-137).  The radiologist's impression was moderate degenerative changes at C 4-5 and C 5-6, mild to moderate foraminal stenosis bilaterally at C5-6 secondary to degenerative changes and disc space narrowing, early foraminal narrowing on the left at C4-5.  (Tr. 137).  There were also disc bulges present posteriorly in the midline at both levels, the disc material contacted the cord at both levels and appeared to slightly posteriorily displace the cord at C 5-6 and there was no impingement seen.  (Tr. 137).

On September 26, 2001, plaintiff was seen by Dr. Kary Van Allen at Anesthesia & Pain Consultants complaining of pain. (Tr. 163).  Plaintiff reported to Dr. Van Allen that she had slipped and fallen at work about nine years prior, and that two forty pound boxes had fallen on her head about 2 years later.  She began to experience pain about a year after the latter incident.  (Tr. 163).  She had been in pain for the past week and stated that the pain increased when she was in bed or when she tried to lift objects, but that it improved with walking.  (Tr. 163).  She was sleeping only

about 4 hours a night due to the pain.  At the time, plaintiff was working full time as a meat cutter.  (Tr. 163).  Dr. Van Allen prescribed Lortab, Soma[1] and Prozac.[2]

The next recorded visit to Dr. Van Allen was on  November 5, 2001.[3]  (Tr. 162).  The notes indicate that plaintiff presented as tearful, having run out of her medication the previous week.  Dr. Van Allen noted that the Oxycontin dose was inadequate and increased the plaintiff's dosage of both Oxycontin and Elavil, and continued her on Prozac.  His diagnosis was degenerative disc disease at C 4-5, C5-6 and bulging disc at C4-5, C5-6.  (Tr. 162).

On April 3, 2002 plaintiff presented to Healthmark Regional Medical Center ("HRMC") complaining of fever, body aches and leg pain, headache, sore throat and rash, along with vomiting, and diarrhea. (Tr. 138).  She was admitted to the hospital, where she remained until April 12, 2006.  She was diagnosed by Dr. Ruben Garcia with non-menstrual toxic shock syndrome and premature ventricular contractions unifocal, nonmalignant, secondary to toxins from her nonmenstrual toxic shock syndrome.  (Tr. 138).

Plaintiff saw Doctor Garcia for a follow-up visit on April 16, 2002.  (Tr. 253).  At that time she was taking Celebrex, Oxycontin, Roxicodone, Lortab and Valium.  Dr. Garcia scheduled plaintiff for a CT scan that revealed "multiple low density structures in the kidneys consistent with cysts of varying sizes."  (Tr. 142).  Plaintiff returned to Doctor Garcia on April 23, May 14, May 21, June 17, and August 5, 2002 for check-ups.  (Tr. 248-252).

---

[1]Soma (carisprodol) is a muscle relaxant that works by blocking nerve impulses or pain sensations to the brain.

[2]The plaintiff identifies the doctor's notes as reflecting a prescription for "Cozaar,"a drug used for hypertension. While the doctor's notes are not extraordinarily legible, it appears that the reference is to the anti-depressant Prozac, which is also referenced in the next office notes.

[3]There appears to be at least one set of notes  missing, as the medications reflected for the November visit are other than those prescribed at what the record reflects would be the previous visit.

Plaintiff returned to Dr. Van Allen complaining of low back pain on April 29, 2002. (Tr. 161). She indicated that the pain, which had been intermittant prior to her hospitalization, was now constant. (Tr. 161). Dr. Van Allen's impression was degenerative disc disease and bulging discs both at C4-5 and C5-6. He continued plaintiff on Elavil and Oxycontin and ordered an MRI. (Tr. 161).

On April 30, 2002, plaintiff presented to Cardiothoracic Surgical Associates of Northwest Florida where she was seen by ARNP Teresa Yates in conjunction with Dr. Videau. (Tr. 155). ARNP Yates noted that an echocardiogram that was performed on April 4, 2002 showed grossly normal chamber dimension, permanent eustachian valve, preserved left ventricular function, myxomatous mitral valve with early diastolic dysfunction, and mild atrioseptal aneurysm with no pericardial effusion. (Tr. 155). She also noted that plaintiff remained weak and fatigued from her illness, but otherwise was doing fairly well. (Tr. 155). ARNP Yates' impression was trioseptal aneurysm as seen on recent echocardiogram, recent non-menstrual toxic shock syndrome and ongoing tobacco abuse.

Plaintiff returned to Dr. Van Allen in June and September of 2002 complaining of lower back pain, and each time the diagnosis was degenerative disc disease and bulging discs both at C4-5 and C5-6. (Tr. 159-160). At the latter visit she requested something to help her sleep, which she was given, and Dr. Van Allen discussed smoking cessation with her. In January of 2003, she presented for evaluation of her chronic pain and effectiveness of current treatment. (Tr. 182). She complained of cervical spine pain, pain in both her left and right upper extremities, and coughing. She also asked for a work release, stating that she could not work, and indicated that she could not sit for prolonged periods and that her hands and arms would go numb. (Tr. 182). Her current medications were continued, and she was again advised to stop smoking.

Plaintiff was admitted to Healthmark Regional Medical Center after presenting to the emergency room on March 2, 2003 complaining of severe chest pain for two days not alleviated with Nitroglycerine, and palpitations for the past two months. (Tr. 176). MI profiles and serial EKG's were negative for any acute event, and plaintiff's chest pains resolved with morphine. (Tr. 164). Her discharge diagnosis on March 5, 2003 was chest pains and multifocal premature ventricular contractions. (Tr. 164). She was prescribed Toprol XL.

On March 12, 2003, plaintiff was seen by Dr. Van Allen, again complaining of cervical spine pain and bilateral upper extremity pain. (Tr. 180). She repeated her request for a work release because she was unable to sit for prolonged periods and her hands and arms went numb, and also asked for injections if she qualified. The diagnosis was again degenerative disc disease and disc disorder at C4-5 and C5-6, and plaintiff was recommended for a cervical epidural steroid injection. (Tr. 180). Plaintiff was prescribed Kadian and MS-IR for breakthrough pain, and her methodone was discontinued because she indicated it was making her "spacy." She was scheduled for a follow-up in one month, but the record does not reflect that plaintiff attended this appointment, if it was made.

Dr. Garcia completed a Food Stamp Workfare Program Medical Release Form on March 24, 2003 indicating that the plaintiff was unable to work due to cardiac arrythmia and premature ventricular contractions, both due to toxic shock syndrome. (Tr. 184).

On May 15, 2003, plaintiff was admitted to Healthmark Regional Medical Center after complaining of chest pain associated with nausea and vomiting and abdominal pains. (Tr. 187-188). Her nausea and vomiting resolved with IV Zofran, her abdominal pains resolved the next day. She was discharged the following day with a diagnosis of chest pain secondary to panic attacks, and right and left upper quadrant and epigastric pains, possibly secondary to gallbladder disease. (Tr. 186).

Plaintiff went to Dr. Garcia for a follow-up visit on May 20, 2003. (Tr. 303). She complained of nausea, vomiting and diarrhea. Although the results of the plaintiff's gallbladder ultrasound are not specifically mentioned, Dr. Garcia's assessment included renal cysts and liver cysts as well as panic attacks. (Tr. 303). She returned to Dr. Garcia on May 23, 2003 complaining of vomiting and diarrhea and swelling in her feet and legs, as well as abdominal cramping and shortness of breath. (Tr. 302).

Dr. Garcia referred plaintiff to Dr. Clyde Pence, a nephrologist, for her kidney problems in June, 2003. (Tr. 202, 242-243). Dr. Pence indicated that plaintiff appeared to have familial polycystic kidney disease, although her kidney function was "still fairly normal at this point in time." (Tr. 202). Dr. Pence observed that plaintiff had had some difficulty with hypertension, which appeared to be under control,[4] and that she had had a heart attack the previous year.[5] He also noted that her smoking was a risk factor for vascular disease. Dr. Pence stated that patients with polycystic kidney disease and hypertension have a special form of renal hypertension, and that enlarging renal cysts encroach on the surrounding kidney and produce local renal ischemia. She was given a prescription for Altace and her Toprol was reduced. Dr. Pence said he would see the plaintiff again if her blood pressure control was not satisfactory or if her renal function began to deteriorate but he noted that she was "not at risk of dialysis dependency for quite some time, and hopefully never if she corrects some of her habits." (Tr. 202). His assessment indicated familial polycystic kidney disease, hypertension, cigarette smoking, hyperlipidemia by history and coronary artery disease by history. (Tr. 242-243).

---

[4]Precisely when plaintiff's purported blood pressure problems began is not clear. Dr. Garcia's records from April 2002 through October of 2003 report blood pressure readings of 110/68, 107/62, 120/82, 118/72, 120/82, 126/80, 138/84, 120/80, 128/68, and 122/70, even as she gained approximately 40 pounds during this time period. (Tr. 241-253). In August of 2003, when her blood pressure reading was 128/68, Dr. Garcia noted "HTN." (Tr. 244). Plaintiff had been prescribed Topol in March of 2003 after her admission to HRMC for chest pains, but hypertension was not among the diagnoses. (Tr. 164).

[5]As noted above, although plaintiff was admitted to HRMC in March of 2003 with chest pains, myocardial infarction was ruled out.

On July 12, 2003, plaintiff presented to Dr. Tom Kersch for a consultative examination at the request of the Social Security Administration.  (Tr. 204-08).  Dr. Kersch noted plaintiff's chief complaint was intermittent neck pain over the past ten years requiring follow-up by pain consultants, and that plaintiff had been diagnosed with degenerative disc disease C4-5and C5-6.  (Tr. 204).  After examination, Dr. Kersch's impression was cervical disc disease, with plaintiff on chronic narcotics/morphine treatment; unspecified mental health history with a prior history of panic attacks, questionable more significant psychiatric history, hypertension,[6] and rule out deep venous thrombosis on her left leg, unspecified renal impairment, status post toxic shock syndrome and negative recent cardiac evaluation.  (Tr. 205-207).

On July 14, 2003, plaintiff presented to Kent Rowland, PhD., for a psychological evaluation at the request of the Social Security Administration.  (Tr. 209-213).  He noted that plaintiff's primary complaint was of pain in her back, but that she also had a long history of a mood disorder.  (Tr. 209).  Plaintiff reported to Dr. Rowland that although she maintained regular employment, she called in sick a lot when she was depressed.  (Tr. 210).  She also reported that she suffered from degenerative disc disease and polycystic disease, which had "attacked her kidneys and liver." (Tr. 210).  Dr. Rowland's report indicated that plaintiff often experienced pain and numbness and frequently wet the bed.  Again, it appears that the plaintiff mistakenly conveyed that she had a heart attack in April of 2001.

Dr. Rowland noted that plaintiff had been hospitalized many years earlier when she tried to kill her son, and that as a result, she was diagnosed with bipolar disorder and placed on psychotropic medication.  (Tr. 211).  Plaintiff reported sleeping only three to four hours a night and not feeling refreshed.  She stated that

---

[6]Plaintiff's blood pressure was noted as 114/76.  (Tr. 205).

her appetite had increased over the past six months and she had gained 30 pounds.[7]
She reported difficulty controlling her anger, frequent anxiety and nervousness,
racing thoughts, irrational fears and crying spells, difficulty with concentration and
memory, a lack of energy, interest and ability to enjoy activities, frequent
"blackouts," intrusive thoughts of early abuse, and constant depression along with
monthly, three-day periods of excess energy and elation.  (Tr. 211).  Dr. Rowland
noted that plaintiff was quite defensive in talking about information related to her
emotional instability and was "intent on convincing the examiner that her problem
was medical rather than psychological."  (Tr. 211).  Dr. Rowland's diagnostic
impressions after evaluation were: bipolar disorder, mixed with moderate intensity,
and post-traumatic stress disorder.  (Tr. 212).  He assigned her a GAF score of 45.[8]
He commented that from the plaintiff's description of her daily life and that of her
husband, he suspected she was intermittently quite unstable, but that due to her
regular work history he viewed her impairment as "only being at a moderate level for
Bipolar Disorder, although she could be thrown into a severe episode at any time."
(Tr. 212-213).

A Mental Residual Functional Capacity Assessment form ("MRFCA") and a
Psychiatric Review Technique form ("PRT") were filled out by T. Wayne Conger,
PhD. on July 31, 2003.  (Tr. 214-217, 218-231).  On the MRFCA, Dr. Conger indicated
moderate limitations in only three of twenty areas:   ability to maintain attention and
concentration for extended periods, ability to work in coordination with or proximity
to others without being distracted by them, and ability to accept instructions and

---

[7]Dr. Rowland's assessment reflects plaintiff's weight as 140 pounds, a figure which is certainly
inaccurate.  (Tr. 211).  Plaintiff weighed 168 pounds two days earlier during her consult with Dr. Kersch.  (Tr.
205).  Her report of having gained weight was accurate, however.  Plaintiff weighed 134 in April of 2002 (Tr. 253)
and her weight increased to 175 by May of 2003. (Tr. 302).  It was later recorded as 179 in November, December
of 2003 and January of 2004 (tr. 201, 300, 299).

[8]A score between 41 and 50 indicates an individual with "Serious symptoms OR any serious
impairment in social, occupational, or school functioning." DSM-IV-TR (2000).

respond appropriately to criticism from supervisors.  (Tr. 214-215).  In the other seventeen areas he indicated that plaintiff was "not significantly limited."  His summary functional capacity assessment indicated:

> Although the claimant's condition may result in some concentration problems at times, she is mentally capable of performing simple, repetitive tasks on a sustained basis.  She may also be socially uncomfortable and have a negative reaction to criticism at times but she is able to relate effectively in general.  She is judged to have adequate understanding and adaptation abilities.  (Tr. 216).

(Tr. 216).

On the PRT, Dr. Conger noted the plaintiff's bipolar disorder (Tr. 221), and with respect to her limitations noted a mild degree of limitation with respect to restriction of activities of daily living, moderate limitations with respect to difficulties in maintaining social functioning or in maintaining concentration, persistence or pace, and no limitation with respect to episodes of decompensation, each of extended duration.  (Tr. 228).  In none of the categories did he find either a marked or extreme degree of limitation, which level would have satisfied the functional criterion.  He opined that her bipolar disease was in "partial remission" and that at the time of the evaluation, there was "no indication of a mental impairment that would meet or equal any listing." (Tr. 230).

A Physical Residual Functional Capacity Assessment ("PRFCA") was completed on August 11, 2003.  (Tr. 232-239).  Plaintiff's primary and secondary diagnoses were identified as toxic shock syndrome and neck pain, respectively. (Tr. 232).  The examiner found no postural, manipulative, visual, communicative, or environmental limitations.  (Tr. 234-236).  Plaintiff was able to occasionally lift and carry 50 pounds, frequently lift and carry 25 pounds, stand or walk 6 hours of an 8 hour workday, sit for 6 hours in an 8 hour workday, with no limitations on her ability to push or pull.  (Tr. 233).  A handwritten notation appears to say "no findings preclude lt wk [light work]."   (Tr. 234).

On August 8, 2003, plaintiff presented to Dr. Ruben Garcia complaining of chronic diarrhea.  (Tr. 244).  His diagnosis was hypertension, polycystic kidney disease, and chronic diarrhea.  On October 17, 2003, plaintiff returned to see Dr. Garcia, complaining mainly of pain.  (Tr. 241).  The diagnosis was HLD[9] and neck pain.  There was a notation that plaintiff should be referred to pain management, and an apparent prescription for oxycontin.  Plaintiff returned to Dr. Garcia on November 5, 2003 complaining of aching in her right ear.  (Tr. 301).  Dr. Garcia's assessment included HLD, hypertension,[10] and hyperlipidemia.  She went back to Dr. Garcia on December 16, 2003 with an earache in her left ear. (Tr. 300).  Tenderness in her spine was also noted.   Dr. Garcia's assessment included HLD, hypertension,[11] fibromyalgia, and OA.[12]

On January 8, 2004, plaintiff presented to Dr. Garcia complaining of blood in her urine for the past two days and increasing flashes of pain.  (Tr. 299).  Plaintiff was admitted to HRMC with admission diagnoses of 1) ureterolithiasis,[13] 2) hematuria (blood in urine), 3) polycycstic renal disease, and 4) hypertenstion.[14]  She was discharged the following day with her blood pressure under control after having passed a stone.  (Tr. 258-259).  A radiology report dated January 9, 2004 indicated a large mass involving the lower pole of the right kidney and splaying of the calices of the left kidney suggesting the presence of smaller masses.  (Tr. 265).  Further

---

[9]The plaintiff's memorandum did not explain the meaning of "HLD" and the court was unable to locate an explanation of the definition.  Although HLD could presumably refer to hyperlipidemia, which is referenced later in Dr. Garcia's assessment, in a subsequent visit to Dr. Garcia, HLD and hyperlipidemia are listed on two separate lines of a four-line assessment.  (Tr. 301).

[10]Plaintiff's blood pressure was 128/78 at the time of this visit.

[11]Plaintiff's blood pressure was 120/74 at the time of this visit.

[12]This could be osteoarthritis.

[13]Ureterolithiasis is the formation or presence of a stone or stones in one or both of the ureters.

[14]Plaintiff's blood pressure was 174/123 at the time of this visit.

evaluation with ultrasound was recommended if this could not be correlated with previous exams.

Plaintiff presented for follow-up on February 9, 2004. (Tr. 298). Dr. Garcia's assessment was PCK, HLD, fibromyalgia and HTN uncontrolled.[15]  (Tr. 298). He indicated that she should have lab work done monthly. (Tr. 298).

Plaintiff returned to Dr. Garcia on March 8, 2004 for a check up regarding her lab results. (Tr. 297). She complained of swelling in her hands and feet. Dr. Garcia administered a trigger point injections in her shoulders due to pain. His assessment included polycystic kidney disorder, hypertension,[16] and myofascial pain syndrome. (Tr. 297). She saw Dr. Garcia again on April 5, 2004. (Tr. 296). She complained of chest pains, shortness of breath, fever, nausea and vomiting. Dr. Garcia renewed her prescription for oxycontin, and noted PCKO2,[17] hypertension[18] and fibromyalgia in his assessment. What appears to have been a reference to hyperlipidemia was crossed out. (Tr. 296).

Plaintiff presented to Dr. Garcia on April 29, 2004 complaining that her blood pressure had dropped and she experienced chest pain. Her blood pressure was 122/70, and Dr. Garcia's assessment included hypertension, chest pain and fibromyalgia. (Tr. 295). She saw Dr. Garcia again on June 3, July 2, August 9, September 9, October 5, November 5, and December 6, 2004, primarily for check-ups on her hypertension, polycystic kidney disease and fibromyalgia. (Tr. 290-294, 325-326). Dr. Garcia renewed her prescription for oxycontin and noted essentially the same assessment on each visit. Plaintiff's blood pressure remained within a normal

_____

[15]Plaintiff's blood pressure was 160/112 at the time of this visit, and her weight had increased to 192 pounds. (Tr. 298).

[16]Plaintiff's blood pressure was noted as 122/64, and she had lost six pounds since the previous visit. (Tr. 297).

[17]This appears to be a reference to polycystic kidney disorder, although the reference to O2 is unclear.

[18]Plaintiff's blood pressure was 130/76 and her weight was down to 180 pounds.

range, and her weight fluctuated from 176 up to 190 and back to 173.   (Tr. 290-294, 325-326).

When plaintiff went to see Dr. Garcia on January 6, 2005 for a prescription refill, he ordered an MRI. (Tr. 324).  She presented for her follow-up to check the MRI results on February 4, 2005, and for other check-ups on March 4, April 5, and  May 5, 2005. (Tr. 320-323).  At the last visit, plaintiff complained of burning urine, a back ache and chest pains the previous day.  (Tr. 320).

Dr. Garcia filled out a Physical Capacities Evaluation and Clinical Assessment of Pain on May 18, 2005. (Tr. 318-319).  In his estimation, plaintiff could lift ten pounds occasionally to five pounds frequently, sit for two hours during an 8 hour work day and stand or walk for two hours during the same time frame.  (Tr. 318). Plaintiff could frequently engage in gross manipulation and fine manipulation and operate motor vehicles, and occasionally push and pull, climb stairs or balance, bend, reach, work with environmental problems or with or around hazardous machinery. (Tr. 318).  He opined that plaintiff was likely to be absent from work four days per month as a result of her impairments.  (Tr. 318).  With respect to plaintiff's pain, he found that pain was present, intractable and virtually incapacitating, that her pain was greatly increased to such a degree as to cause distraction from or total abandonment of tasks, and that her drug side effects could be expected to be severe and to limit her effectiveness due to distraction, inattention, and drowsiness.  (Tr. 319).

Dr. Garcia also wrote a letter "to whom it may concern" indicting that plaintiff was disabled from employment due to her polycystic kidney disease, fibromyalgia hypertension and lumbar disc disease with cervical disc disease.  (Tr. 329).

Plaintiff testified at the hearing that she had not worked since her alleged onset date of April 3, 2002 when she caught a blood disease from meat she handled as part of her job. (Tr. 362-363).  She stated that she was very ill for a while, had a lot

of back pain and then found out she had kidney disease because she started "messing [her] pants all the time." (Tr. 363). When asked, plaintiff indicated that her biggest problem was her kidney disease, which was treated by her family physician Dr. Garcia. (Tr. 363). She stated that she had a kidney doctor, but that he would not start treating her until she began dialysis. (Tr. 363-364). Plaintiff indicated that she took pain medication and blood pressure medication for her kidney, but that she had not had surgery. (Tr. 364). She said that she was in pain "all the time," and that after taking the medication her pain was reduced only to a six on a scale of one to ten. (Tr. 365). Plaintiff indicated that she had bowel movements in her pants because she can not feel it coming out, and that she urinated five times a night while she is sleeping.[19] (Tr. 365-66). She stated that she wears Depends protective briefs, but that she tries "not to stray too far from home." (Tr. 366). Plaintiff also testified that she had back pain that burned down both sides of her hips and down her legs as well as stiffness and spasms. (Tr. 366-368). She said that Dr. Garcia was trying to get her into pain management, as had been done some years prior for her neck, and that even after taking her pain medication her pain was a six or seven on a ten-point scale, but sometimes worse. (Tr. 366-368, 381). She indicated her neck pain was constant, but was not as bad as her kidneys hurt, only about a four to five after taking her medication. (Tr. 368-369).

Plaintiff testified that she was taking Prozac and Restoril for depression and nerves, but that she was not seeing a psychiatrist or therapist. (Tr. 369). She stated that three or four times a year she stayed in bed for four or five days and could not get up due to her depression. (Tr. 370). In response to questioning from the ALJ she stated that she sometimes had thoughts of harming herself, although she had not actually tried to do it since she was younger, that paranoid thoughts were a

---

[19]Although plaintiff stated "for urine I just go while sleeping," suggesting that she urinated in her sleep, later in the transcript counsel's question appeared to suggest that she got up to use the bathroom, rather than urinated uncontrollably in her sleep. (Tr. 382).

problem for her, that she got only three to four hours of sleep a night, that she had mood swings and racing thoughts or racing heart. (Tr. 370-371). She acknowledged that her symptoms had improved since Dr. Garcia had increased her dosage of Prozac and added Restoril. (Tr. 372).

Plaintiff volunteered that she had problems with her grip, and that she frequently dropped things or had difficulty opening jars and that every once in a while she can not feel her palms or fingers. (Tr. 372-373). She testified that her fibromyalgia manifested itself in her knees and hips, that it was hard for her to just get up and start walking after she had been sitting, and that she had constant pain (Tr. 373-374). This pain stayed at a five on a ten point scale even after taking her medication. (Tr. 374). She indicated that her medications made her dizzy, light-headed and tired all the time. (Tr. 374, 381).

With respect to her mobility, plaintiff stated that walking was easiest for her, but she was unable to stand for long periods in one place or to sit any longer than 10 to 15 minutes without walking, and that things like kneeling or squatting were painful. (Tr. 375). She said she was able to take care of her personal hygiene, but her husband did the cooking and most of the cleaning. (Tr. 376). Plaintiff did the dishes in small intervals, assisted with grocery shopping, and cut the grass, but when asked about visiting family or friends or attending church stated that she had not gone anywhere in the past year because of "having accidents." (Tr. 376-377).

Plaintiff testified that she ran out of pain medication every month because there were days when she had to take more than what was prescribed. (Tr. 381-382). She indicated that she had to take extra pain medication about ten days per month, and also that about four or five times a month her feet were so swollen she could not get shoes on. (Tr. 382). Plaintiff explained that she had had about ten incidents where she went to the bathroom without realizing it, which was why she tried to stay home. (Tr. 383).

**DISCUSSION**

The plaintiff raises three issues in this appeal: 1) the ALJ failed to properly reject the opinion of Dr. Garcia; 2) the ALJ erred in applying the Eleventh Circuit's three part pain standard; and 3) the plaintiff's polycystic kidney disease would greatly affect her ability to work. The Commissioner argues that the ALJ's findings were supported by substantial evidence and must, therefore, be sustained. The issue thus presented is whether the ALJ's decision that the plaintiff was not disabled, in light of her physical condition, age, education, work experience, and residual functional capacity, is supported by substantial evidence in the record.

**1.    Treating physician's opinion.**

Plaintiff first contends that the ALJ erred in discounting the opinion of Dr. Garcia, and that his opinion should have been given controlling weight as it was consistent with the substantial medical evidence of record. Absent good cause, the opinion of a claimant's treating physician must be accorded considerable or substantial weight by the Commissioner. *Phillips v. Barnhart*, 357 F.3d 1232, 1240-1241 (11th Cir. 2004); *Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997); *Broughton v. Heckler*, 776 F.2d 960, 960-961 (11th Cir. 1985); *Jones v. Bowen*, 810 F.2d 1001, 1005 (11th Cir. 1986). "Good cause" exists when: (1) the treating physician's opinion was not bolstered by the evidence; (2) the evidence supported a contrary finding; or (3) the treating physician's opinion was conclusory or inconsistent with the doctor's own medical records. *Phillips,* 357 F.3d at 1241; see also *Lewis*, 125 F.3d at 1440 (citing cases). Generally, a treating physician's medical opinion is entitled to greater weight than the opinion of a consulting physician. 20 C.F.R. § 404.1527; *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984); *Spencer on Behalf of Spencer v. Heckler*, 765 F.2d 1090, 1094 (11th Cir. 1985); *Hurley v. Barnhart*,

385 F.Supp.2d 1245, 1255 (M.D.Fla. 2005).  "When electing to disregard the opinion of a treating physician, the ALJ must clearly articulate its reasons." *Phillips*, 352 F.3d at 1241.   Failure to do so is reversible error.  *Lewis*, 125 F.3d at 1440 (citing *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986));[20] *see also Nyberg v. Commissioner of Social Security*, 179 Fed.Appx. 589, 591 (11th Cir. 2006) (Table, text in WESTLAW)(also citing *MacGregor*).  The opinion of a nonexamining physician is entitled to little weight, and, if contrary to the opinion of a treating physician, is not good cause for disregarding the opinion of the treating physician.  *See Broughton v. Heckler*, 776 F.2d 960, 962 (11th Cir. 1985); 20 CFR § 404.1527(d)(2).   However, a brief and conclusory statement that is not supported by medical findings, even if made by a treating physician, is not persuasive evidence of disability.  *Johns v. Bowen*, 821 F.2d 551, 555 (11th Cir. 1987); *Warncke v. Harris*, 619 F.2d 412, 417 (5th Cir. 1980).

Plaintiff argues that Dr. Garcia's opinions should be afforded controlling weight because they are supported by medically acceptable clinical and diagnostic techniques and are consistent with the substantial medical evidence of record.

As noted above, Dr. Garcia first saw the plaintiff on April 3, 2002 when she was diagnosed with toxic shock syndrome and hospitalized for nine days.  He treated her through 2005.  In May of 2005, he completed a physical capacities evaluation form. (Tr. 318).  On this form, he indicated that plaintiff could lift or carry ten pounds occasionally and five pounds frequently, that she could sit for two hours in an eight-hour work day and stand or walk for two hours in an eight hour work day, that she could occasionally[21] push and pull, climb and balance, bend and/or stoop, reach, be exposed to environmental problems, and work around hazardous

---

[20]*MacGregor* further held that "Where the [Commissioner] has ignored or failed properly to refute a treating physician's testimony, we hold as a matter of law that he has accepted it as true." 786 F.2d at 1053.

[21]The form indicates that "occasionally" means 6% to 33% of an 8 hour work day.

machinery, and frequently[22] perform gross and fine manipulation, and operate motor vehicles.[23]  Dr. Garcia opined that plaintiff would be likely to be absent from work more than four days per month as a result of the impairments of treatment.

Dr. Garcia also completed a Clinical Assessment of Pain on the same date. In this form, he indicated that pain would be present and found to be intractable and virtually incapacitating, that physical activity would greatly increase pain to such a degree as to cause distraction from tasks or total abandonment of tasks, and, of greatest relevant to the plaintiff's appeal, that plaintiff's drug side effects could be expected to be severe and to limit her effectiveness  due to distraction, inattention and drowsiness.  (Tr. 319).

On June 8, 2005 Dr. Garcia wrote out a general statement opining that the plaintiff was "disabled from employment" due to (1) polycystic kidney disease; (2) fibromyalgia; (3) hypertension; and (4) lumbar disc disease with cervical disc disease.  (Tr. 329).

The ALJ acknowledged that the medical evidence indicated that plaintiff had cervical and lumbar degenerative disc disease, fibromyalgia and an affective disorder, but that "[n]o treating or examining physician has mentioned findings, either singularly or in combination, equivalent in severity to the criteria of any listed impairment."  (Tr. 16).   She also stated that plaintiff's kidney disease and hypertension, two of the limitations identified by Dr. Garcia, were "well controlled with medication . . . and do not cause more than minimal impact on her ability to perform basic work, according to her medical records."  (Tr. 17).  She agreed that if

---

[22]The form indicates that "frequently" means 34% to 66% of an 8 hour work day.  There is no category indicating more than 66% of an eight hour work day.

[23]The Commissioner notes that due to an error in the formatting of the form, it is impossible to determine in precisely which categories Dr. Garcia ascribed frequent vs. occasional limitations. Although the activities are not exactly lined up with the boxes that were checked, because there are nine activities and nine rows of boxes, it is not unreasonable to conclude that they can be matched in the corresponding order.

plaintiff's testimony regarding her pain and limitations were accepted as credible, that a finding of disability would be appropriate.  (Tr. 18).  However, the ALJ found that plaintiff's testimony was not credible, and also that Dr. Garcia's[24] opinions with respect to the issue of disability were unsupported.  She observed that there were "no treatment notes or any other objective medical documentation that support [Dr. Garcia's] conclusions on the issue of disability, or that the claimant experience (sic) an incapacitating amount of pain or that she would miss four days of work a month." (Tr. 18).  Recognizing that the DDS physicians opined that plaintiff was capable of performing medium work, the ALJ nonetheless determined that the plaintiff could perform a range of light work.  She expressly stated that she considered plaintiff's daily activities, including a form plaintiff completed in June of 2003, in reaching her conclusion.  (Tr. 18).  The ALJ also considered the fact that plaintiff's husband receives Social Security disability benefits in assessing the credibility of plaintiff's reported self-limitations.

At steps 4 and 5 of the evaluation process it is appropriate for the Administrative Law Judge to consider a plaintiff's daily activities.  *Macia v. Bowen*, 829 F.2d 1009, 1012 (11th Cir. 1987); *Hennes v. Commissioner of Social Sec. Admin.*, 130 Fed.Appx. 343, 349 (11th Cir. 2005) (table, text in WESTLAW).  If daily activities are to be considered, however, the Administrative Law Judge must do so in the context of all of the evidence in the record:

> We have consistently held that in ascertaining whether the [Commissioner's] findings are supported by substantial evidence, we do not consider only those parts of the record that support those findings, but rather must  "view the entire record and take account of evidence in the record which detracts from the evidence relied on by the [Commissioner]."

---

[24]Dr. Garcia is referenced at one point on page 5 of the ALJ's opinion as "Dr. Ruben." (Tr. 18).  "Ruben" is Dr. Garcia's first name.

*Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986); *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995).

The *Parker* court found the Administrative Law Judge's reliance upon plaintiff's "daily activities" to discount her testimony as to pain to have been flawed for failure to consider the plaintiff's testimony that she had to lie down every two hours, that she had difficulty standing, fatigue and blurred vision.  793 F.2d at 1180. Similarly, in *Foote v. Chater*, the court held that a conclusory citation to a plaintiff's "daily activities" as a basis for failing to believe her testimony as to pain was insufficient where there was a medical condition that reasonably could have given rise to the pain described, and, although she testified that she cooked and shopped for herself, she had trouble putting on her clothing.  67 F.3d at 1561.  And in *Lewis v. Callahan,* 125 F.3d 1436 (11th Cir.1997), the court held that participation in "everyday activities of short duration, such as housework or fishing," does not disqualify a plaintiff from disability, so long as such activities are not inconsistent with limitations recommended by the treating physicians.  125 F.3d at 1441.  In this case, the limited activities reported by the plaintiff do not appear to disqualify her from disability.

While plaintiff makes a general assertion that the ALJ did not properly weigh Dr. Garcia's medical opinion, her only specific complaint relates to the alleged side effects of her medication.    Dr. Garcia's treatment of plaintiff was not isolated.  He saw her over a dozen times since her alleged onset date.  He believed plaintiff's reports of pain because he continually renewed plaintiff's prescription for Oxycontin, a strong pain killer.   A form listing plaintiff's medications, stamped with a received date of May 9, 2005, reflected that plaintiff was taking Oxycontin, Ultracet for pain, the muscle relaxant Skelaxin, Tarka for high blood pressure, Risperdal for nerves, Ditropan XL for frequent urination and Symbyax for depression.  (Tr. 327-328). Plaintiff testified at the hearing that her medications made her dizzy, lightheaded and

sleepy.  (Tr. 374, 381).[25]  Although plaintiff's complaints about side effects from her medication do not appear to be noted in Dr. Garcia's records, her testimony is consistent with the Clinical Assessment of Pain form wherein Dr. Garcia indicated that drug side effects would limit plaintiff's effectiveness in a work environment due to distraction, inattention and drowsiness (Tr. 319).[26]

The ALJ listed "type, dosage, effectiveness and adverse side-effects of any pain medication" among the factors to be considered in evaluating a plaintiff's subjective complaints. (Tr. 17-18).  However, she did not otherwise mention this plaintiff's specific medications or their side effects in her decision.  In *Ezell v. Massanari*, 180 F.Supp.2d 1306 (S.D. Ala. 2001), the ALJ failed to discuss his reasons for rejecting the treating physician's opinion with respect to the side effects of the

---

[25]Counsel also mentioned side effects from plaintiff's medication in his opening remarks.  (Tr. 358).

[26]The court has ascertained the following common side effects for the medications reported by plaintiff:

**OxyContin** will cause drowsiness or dizziness.  It also may increase the effects of other drugs that cause drowsiness, including antidepressants, other antihistamines, other pain relievers, anxiety medicines, seizure medicines, and muscle relaxants. Dangerous sedation, dizziness, or drowsiness may occur if OxyContin is taken with any of these medications.
www.drugs.com/oxycontin.html

Common side effects of **Ultracet** include dizziness, drowsiness, or headache; nervousness, tremor, or anxiety; nausea, constipation, or diarrhea; or itching, dry mouth, or sweating.  Certain agents may worsen the effect of sleepiness.  www.drugs.com/ultracet.html

**Skelaxin** may cause drowsiness or dizziness; headache, nervousness, or irritability; or nausea, upset stomach, or vomiting.   "Many drugs can increase the effects of Skelaxin, which can lead to heavy sedation." Anti-depressants and narcotic pain killers are two classes of drugs specifically listed as potentially increasing side effects, and oxycodone is one of the drugs mentioned by name.  www.drugs.com/skelaxin.html

**Tarka**'s side effects include mild dizziness or lightheadedness; headache; dry, tickling cough; flushing (redness); insomnia and vivid dreams; numbness or tingling in the hands, feet, arms, or legs; nausea, constipation, or diarrhea; weakness or fatigue; or a rash. Www.drugs.com/tarka.

The potential side effects of **Risperdal**, when used to treat bipolar disorder, included sleepiness, muscle stiffness, restlessness, tremor, indigestion, nausea, abnormal vision, muscle aches, dizziness, runny nose, diarrhea, increased saliva, stomach pain, and urinary incontinence.  www.risperdal.com

**Ditropan** XL's common side effects include dry mouth, constipation, drowsiness, headache, blurred vision, dizziness, diarrhea, and nausea.  www.ditropanxl.com

**Symbyax** may cause weight gain, sleepiness, diarrhea, dry mouth, increased appetite, feeling weak, swelling of the hands and feet, tremors (shakes), sore throat, and trouble concentrating.  www.symbyax.com

plaintiff's medications.  180 F.Supp.2d at 1309.  The court found that this failure was reversible error.  Plaintiff argues that the ALJ has made a similar failing in this case.

In her decision, the ALJ noted that if the plaintiff was capable of performing the full range of light work, a finding of "not disabled" would be directed by the Medical-Vocational Guidelines.  (Tr. 19).  However, the ALJ further noted that the claimant's ability to perform all or substantially all of the requirements of light work was impeded by "additional exertional and/or non-exertional limitations," without specifically identifying these limitations.  Although the ALJ could conceivably be referring to the limitations imposed by plaintiff's medications, it is not certain that that was the case.

As noted above, at the hearing, the vocational expert testified that an individual with the claimant's limitations could not return to her past work, but there were jobs in the light category which she could do, including distribution clerk, shipping weigher and house sitter.  (Tr. 379).  The vocational expert also identified sedentary jobs for which plaintiff would be qualified:  sack repairer, scheduler, and data examination clerk.  (Tr. 380).  In response to further questioning, the vocational expert indicated that the plaintiff's reaction to pain and the reaction to pain medication would "certainly" eliminate the sedentary jobs.  (Tr. 381).  The vocational expert's apparent testimony, that claimant could do light work but not sedentary work with these limitations, seems to be at odds with the Commissioner's rules, which define "light work" as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.  *If someone can do light work, we determine that he or she*

> *can also do sedentary work, unless there are additional limiting factors
> such as loss of fine dexterity or inability to sit for long periods of time.*

20 C.F.R. § 404.1567(b) (emphasis added).

Irrespective of this apparent discrepancy, if the ALJ accepted plaintiff's limitations with respect to her pain and the reaction to the medications, she would not be able to perform the three sedentary jobs identified by the vocational expert. And, despite the reference to the existence of "exertional and/or non-exertional limitations" in her opinion, the ALJ listed both the light and the sedentary jobs that had been identified by the vocational expert as jobs the plaintiff could perform. The ALJ specifically found that plaintiff's testimony about her level of pain was not credible. The ALJ failed to expressly discredit or discuss the plaintiff's limitations due to effects of the pain medication, but the Commissioner argues that it is reasonable to assume that Dr. Garcia's finding regarding the side effects from plaintiff's pain medication was discounted for the same reasons the remainder of his opinion was discounted: that there were no treatment notes or any other objective medical documentation that supported his findings.

In a questionnaire submitted in conjunction with plaintiff's disability application in 2003, plaintiff listed only two medication side effects:  constipation and diarrhea. (Tr. 107). The lone instance in the medical record identified by either party where plaintiff complained of medication side effects was in March of 2003, when she complained that methadone made her "spacey," and it was discontinued. (Tr. 180). The record does not reflect that Dr. Garcia was concerned about the side effects of the medications he prescribed for the plaintiff.  See *Swindle v. Sullivan*, 914 F.2d 222, 226 (11th Cir. 1990); *French v. Massanari*, 152 F.Supp.2d 1329, 1338 (M.D. Fla. 2001).  There is no record evidence that plaintiff complained to Dr. Garcia or any other physician about side effects from her medication.   *Turner v. Commissioner of Social Security*, 182 Fed. Appx. 946 (11th Cir. 2006) (ALJ did not err

in discrediting plaintiff's testimony about side effects when there was no evidence that she had made consistent complaints about such side effects to her treating physicians); cf. *Flores v.  Massanari*, 19 Fed. Appx. 393 (7th Cir. 2001) (record was "replete with evidence" that claimant had complained of side effects from medication to several physicians).  Thus, it is true that  the only evidence in the file that plaintiff suffered from side effects from her medication was the clinical assessment of pain form filled out by Dr. Garcia (Tr. 319) and plaintiff's testimony. See, e.g. *Holley v. Chater*, 931 F.Supp. 840, 850 (S.D. Fla. 1996) (when the sole evidence of side effects is plaintiff's testimony that medication makes him "dizzy and drowsy," such "scant" evidence is insufficient to support a finding of disability). However, the court finds that because the plaintiff was taking a wide variety of medications, many of which, whether taken individually or in combination with other medications, commonly cause drowsiness or other effects of which plaintiff has complained, and because the ALJ failed to specifically address the side effects of plaintiff's medications, this case should be remanded for further consideration of this issue.

### 2.  Three part pain standard

Plaintiff next maintains that the ALJ's decision should be reversed because she did not apply the three-part pain standard required in the Eleventh Circuit.

As this court is well aware, pain is treated by the Regulations as a symptom of disability.  Title 20 C.F.R. § 404.1529 provides in part that the Commissioner will not find disability based on symptoms, including pain alone, ". . . unless medical signs or findings show that there is a medical condition that could be reasonably expected to produce these symptoms."  *Accord* 20 C.F.R. § 416.929.  The Eleventh

Circuit has articulated the three-part pain standard, sometimes referred to as the *Hand*[27] test, as follows:

> In order to establish a disability based on testimony of pain and other symptoms, the claimant must satisfy two parts of a three-part test showing: (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain.

*Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Ogranaja v. Commissioner of Social Security*, 2006 WL 1526062, *3+ (11th Cir. 2006) (quoting *Wilson*) (Table, text in WESTLAW); *Elam v. Railroad Retirement Bd.*, 921 F.2d 1210, 1216 (11th Cir. 1991);.

The Eleventh Circuit has also approved an ALJ's reference to and application of the standard set out in 20 C.F.R. § 404.1529, because that regulation "contains the same language regarding the subjective pain testimony that this court interpreted when initially establishing its three-part standard." *Wilson, supra*, 284 F.3d at 1226. Thus, failure to cite to an Eleventh Circuit standard is not reversible error so long as the ALJ applies the appropriate regulation.

But "[w]hile both the Regulations and the *Hand* standard require objective medical evidence of a condition that could reasonably be expected to cause the pain alleged, neither requires objective proof of the pain itself." *Elam*, 921 F.2d at 1215. The Eleventh Circuit has held that "pain alone can be disabling, even when its existence is unsupported by objective evidence." *Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995)(citing *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992)); *Walker v. Bowen*, 826 F.2d 996, 1003 (11th Cir. 1987); *Hurley v. Barnhart*, 385

---

[27]*Hand v. Bowen*, 793 F.2d 275, 276 (11th Cir.1986) (the case originally adopting the three-part pain standard).

F.Supp.2d 1245, 1259 (M.D.Fla. 2005) .  However, the presence or absence of evidence to support symptoms of the severity claimed is a factor that can be considered.  *Marbury*, 957 at 839-840;  *Tieniber v. Heckler,* 720 F.2d 1251, 1253 (11th Cir. 1983).

Finally, if the Commissioner refuses to credit subjective testimony of the Plaintiff concerning pain she must do so explicitly and give reasons for that decision.  *MacGregor v. Bowen*, 786 F.2d at 1054.   Where she fails to do so, the Eleventh Circuit has stated that it would thus hold as a matter of law that the testimony is accepted as true.  *Holt v. Sullivan*, 921 F.2d at 1223; *MacGregor v. Bowen*, 786 F.2d at 1054.  Although the Eleventh Circuit does not require an  explicit finding as to a claimant's credibility, the implication must be obvious to the reviewing court.  *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).  The credibility determination does not need to cite particular phrases or formulations but it cannot merely be a broad rejection which is not enough to enable the reviewing court to conclude that the ALJ considered the claimant's medical condition as a whole.  *Dyer*, 395 F.3d at 1210 (11th Cir. 2005) (internal quotations and citations omitted).  And of course, the reasons articulated for disregarding the plaintiff's subjective pain testimony must be based upon substantial evidence.  *Wilson*, 284 F.3d at 1225-1226; *Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991); *Hurley*, 385 F.Supp.2d at 1259.

Underlying the *Hand* standard is the need for a credibility determination concerning a plaintiff's complaints of pain.  Those complaints are, after all, subjective.  "[T]he ascertainment of the existence of an actual disability depend[s] on determining the truth and reliability of [a claimant's] complaints of subjective pain."  *Scharlow v. Schweiker*, 655 F.2d 645, 649 (5th Cir. 1981) (holding that the ALJ must resolve "the crucial subsidiary fact of the truthfulness of subjective symptoms

and complaints").[28]  People with objectively identical conditions can experience significantly different levels of pain, and pain is more readily treated in some than in others.   "Reasonable minds may differ as to whether objective medical impairments could reasonably be expected to produce [the claimed] pain.  This determination is a question of fact which, like all factual findings by the [Commissioner], is subject only to limited review in the courts . . . ."  *Hand, supra,* at 1548-49.  It is within the ALJ's "realm of judging" to determine whether "the quantum of pain [a claimant] allege[s] [is] credible when considered in the light of other evidence."  *Arnold v. Heckler*, 732 F.2d 881, 884  (11th Cir. 1984).   Thus, a physician may be told by a patient that he or she is in pain, and the physician may believe it, but the ALJ is not bound by that.  The evidence as a whole, including the existence of corroborating objective proof or the lack thereof, and not just a physician's belief, is the basis for the ALJ's credibility determination.

Although the ALJ did not specifically cite to the *Hand* standard, or 29 C.F.R. § 404.1529, she specifically found that the "medical documentation fails to support the claimant's alleged degree of pain and the functional restrictions she experiences." (Tr. 18).  She further noted that there were no treatment notes or any other objective medical documentation that support Dr. Garcia's opinion that the plaintiff experiences an incapacitating amount of pain or that she would miss four days of work a month. (Tr. 18).  She contrasted Dr. Garcia's opinion with that of the consulting physicians.   Finally, the ALJ also pointed out that plaintiff's own limitations appeared to be contradicted by her daily activities. (Tr. 18-19).  The ALJ did not err in discounting plaintiff's subjective complaints of pain, and she is not entitled to reversal on this claim.

---

[28]  Decisions of the United States Court of Appeals for the Fifth Circuit decided prior to September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. Pritchard*, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

     **3.**    **Plaintiff's polycystic kidney disease was not considered**

Plaintiff's last contention is that the ALJ's decision should be reversed because she did not consider the work limitations imposed by plaintiff's polycystic kidney disease in her assessment. Plaintiff maintains that two of the primary symptoms about which she testified, her pain and her incontinence would greatly affect her ability to work. She maintains that at the least the ALJ should have requested testimony from a medical expert explaining how polycystic kidney disease affects individuals.

Plaintiff testified at the hearing that she had not worked since her alleged onset date of April 3, 2002 when she caught a blood disease from meat she handled as part of her job. (Tr. 362-363). She stated that she was very ill for a while, had a lot of back pain and then found out she had kidney disease because she started "messing [her] pants all the time." (Tr. 363). When asked, plaintiff indicated that her biggest problem was her kidney disease, which was treated by her family physician Dr. Garcia. (Tr. 363). She stated that she had a kidney doctor, but that he would not start treating her until she began dialysis. (Tr. 363-364). Plaintiff indicated that she took pain medication and blood pressure medication for her kidney, but that she had not had surgery. (Tr. 364). She said that she was in pain "all the time," and that after taking the medication her pain was reduced only to a six on a scale of one to ten. (Tr. 365). Plaintiff indicated that she had bowel movements in her pants because she can not feel it coming out, and that she urinated five times a night while she is sleeping.[29] (Tr. 365-66). She stated that she wears Depends protective briefs, but that she tries "not to stray too far from home." (Tr. 366). She later said she had not gone anywhere in the last year because of her having accidents. (Tr. 377). She testified that she had had about ten incidents where she went to the bathroom

---

[29]Although plaintiff stated "for urine I just go while sleeping," suggesting that she urinated in her sleep, later in the transcript counsel's question appeared to suggest that she got up to use the bathroom, rather than urinated uncontrollably in her sleep. (Tr. 382).

without realizing it.  (Tr. 383).  Comparatively, she said that her neck pain was not quite as bad as her kidney pain.  (Tr. 368).

In her opinion, the ALJ noted that plaintiff's treating physician had stated that she suffered from polycystic kidney disease.  (Tr. 16).  Although there was detailed discussion about other of the plaintiff's impairments, with respect to the kidney disease, the ALJ stated that merely it was "well controlled with medication" and did not "cause more than minimal impact on her ability to perform basic work, according to her medical records."  (Tr. 17).  The ALJ found that plaintiff's testimony "was not completely credible in light of the reports of the treating and examining physicians," (Tr. 18), although she did not indicate if she discredited plaintiff's reporting generally, or with respect to specific limitations, such as plaintiff's claims with respect to her incontinence.[30]  The ALJ noted that if the plaintiff's testimony regarding her pain and limitations was accepted at face value, then a finding of disability would be appropriate, but that the medical documentation did not support the plaintiff's alleged degree of pain and the functional restrictions she claimed to experience.  (Tr. 18).  In her final findings, the ALJ did not include mention of the plaintiff's polycystic kidney disease among the impairments she deemed to be "severe."[31]  (Tr. 21).

The plaintiff maintains that this case should be remanded for the ALJ to include the work limitations she testified to with respect to her kidney disease in her assessment.  The court concurs that the issues of plaintiff's urinary and/or bowel incontinence were not adequately addressed by the ALJ.  Therefore, these issues also should be addressed upon remand.

---

[30]The court also notes that incontinence is a potential side effect of one of the medications plaintiff was taking, Risperdal.

[31]An impairment is not severe if it does not significantly limit a claimant's physical or mental ability to do basic work activities.  20 C.F.R. § 404.1521.

## CONCLUSION

This court has the authority to "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." Title 42 U.S.C. § 405(g). Remand is ordinarily appropriate for rehearing if the Commissioner failed to apply the law and regulations, or where the taking of additional evidence is necessary. The court can reverse without remand where the Commissioner's decision is in plain disregard of the law and evidence. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *MacGregor, supra; Hale, supra*. Moreover, the failure to apply the correct legal standard is grounds for reversal, not remand. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1983). When evidence has been fully developed and points unequivocally to a specific finding, the court may enter the finding that the Commissioner should have made. This is not such a case. As noted above, this case should be remanded for specific consideration of the side effects of the plaintiff's medication and the plaintiff's polycystic kidney disease and their effects on her ability to work.

Accordingly, it is respectfully RECOMMENDED that the decision of the Commissioner be REVERSED, that the Commissioner be ordered to remand this case to the ALJ for further proceedings consistent with this report and recommendation, that judgment be entered in favor of plaintiff pursuant to sentence four of 42 U.S.C. § 405 (g), and that the clerk be directed to close the file.

At Pensacola, Florida this 23rd day of October, 2006.

/s/ *Miles Davis*

**MILES DAVIS**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

Any objections to these proposed findings and recommendations must be filed within ten days after being served a copy hereof.  <u>Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.</u>  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; *United States v. Roberts,* 858 F.2d 698, 701 (11th Cir. 1988).